1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TROY MAGARRELL,

11            Plaintiff,              No. CIV S-04-2634-LKK-DAD P

12        vs.

13   P. MANGIS, M.D., et al.,

14            Defendants.            <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16            Plaintiff is a state prisoner proceeding through counsel with a civil rights action

17   seeking relief under 42 U.S.C. § 1983.  This matter is before the court on defendant Roche's

18   motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil

19   Procedure.  Plaintiff has filed an opposition to the motion, and defendant has filed a reply.  On

20   July 31, 2009, the undersigned heard oral arguments in this matter.

21                              **BACKGROUND**

22            Plaintiff is proceeding on his original complaint against defendants Drs. Roche

23   and Mangis.[1]  Therein, he alleges as follows.  On October 29, 2003, after three days of

24   _____

25        [1] Defendant Dr. Roche is represented by Stanzler Funderburk and Castellon, LLP.
     Defendant Dr. Mangis is represented by the Office of the Attorney General.  Counsel on behalf of
26   defendant Dr. Mangis has also filed a motion for summary judgment, which the court addresses
     in separate findings and recommendations.

1

1  complaining of pain due to kidney stones, plaintiff received a shot containing a pain killer at

2  High Desert State Prison's ("HDSP") Correctional Treatment Center.  Plaintiff went to the yard

3  clinic the next morning for a follow-up visit with Dr. Mangis.  Plaintiff overheard the defendant

4  comment that all inmates are drug addicts and that plaintiff merely wanted a shot of dope.

5  (Compl. at 3.)

6         At the clinic, plaintiff submitted a urine sample, which contained trace amounts of

7  blood.  He also underwent a blood-sugar test.  Plaintiff then met with Dr. Mangis who asked him

8  a series of questions, which allegedly had nothing to do with kidney stones.  Plaintiff told the

9  doctor to look at his medical file to understand his history with kidney stones, but Dr. Mangis

10  responded by suggesting that plaintiff was only interested in drugs.  Dr. Mangis also accused

11  plaintiff of adding blood to his urine sample.  (Compl. at 3-4 & Ex. C.)

12         Dr. Mangis told plaintiff to lay down on the examining table and bring his knees

13  up and then squeezed plaintiff's left kidney area.  Plaintiff tried to get away and yelled for him to

14  stop, but Dr. Mangis then squeezed his right kidney area.  When plaintiff broke away, Dr. Mangis

15  said "See you don't have kidney stones" and ordered correctional officers to take plaintiff back to

16  his cell.  Plaintiff alleges that he had difficulty urinating thereafter and began submitting sick-call

17  slips.  (Compl. at 4.)

18         On November 10, 2003, when plaintiff saw him a second time, Dr. Mangis

19  refused to open plaintiff's medical file and instead touched plaintiff's back with his finger and

20  proclaimed him stone-free.  According to plaintiff, his medical file contained 198 pages

21  documenting his history with kidney stones, dating as far back as 1992, when he was incarcerated

22  at the California Youth Authority.  (Compl. at 4 & Ex. D.)

23         Plaintiff submitted an inmate appeal and explained that he had a kidney stone that

24  was stuck and was causing him pain and hindering his urine flow.  He asked for a diagnostic test,

25  such as an x-ray or an ultrasound.  He also asked to see Dr. Lajeunesse, a urologist familiar with

26  his case, to remove the kidney stone.  Plaintiff did not receive a reply, so he re-submitted the

2

appeal on November 25, 2003.  Again, he did not receive a reply, so he re-submitted the appeal on December 10, 2003, and labeled it an "emergency appeal."  Defendant Dr. Roche, however, refused to treat it as an emergency appeal.  (Compl. at 5 & Ex. F.)

On January 16, 2004, plaintiff met with Dr. James regarding his inmate appeal. Dr. James denied the appeal with defendant Roche's approval.  Plaintiff then submitted additional sick-call slips and sent his appeal to the next level.  Subsequently, plaintiff showed Dr. James his medical file, including a 2002 operative report by Dr. Lajeunesse stating that he would need to be followed closely and that he had a significant risk for recurrence of his stricture.  Dr. James then agreed to send plaintiff to see Dr. Lajeunesse.  (Compl. at 5 & Exs. F, G.)

In early May 2004, plaintiff passed a kidney stone.  On May 10, 2004, he saw Dr. Lajeunesse and provided her with the stone for analysis.  He also told her about his seven consecutive months of suffering pain.  Dr. Lajeunesse told correctional officers to take plaintiff across town to the emergency room to have an emergency CT scan.  The scan showed that he had four additional kidney stones, so Dr. Lajeunesse scheduled him for surgery.  (Compl. at 6 & Exs. H, I, J.)

On June 16, 2004, plaintiff was in extreme pain and could not urinate.  He could only drip blood from his penis.  Correctional officers emergency transported him to Northern Nevada Medical Center where he passed another kidney stone.  On July 22, 2004, plaintiff saw Dr. Lajeunesse, and she requested an "urgent" operation for him.  (Compl. at 6-7 & Exs. K, L.)

On July 23, 2004, plaintiff was in extreme pain again and went to HDSP's Correctional Treatment Center.  Plaintiff alleges that defendant Dr. Roche refused to treat him and told the nurse to send him back to administrative segregation.  Dr. Roche said "We already know you have kidney stones.  Your [sic] scheduled for surgery soon."  On August 3, 2004, plaintiff underwent surgery.  During the procedure, the doctor removed or treated eight kidney stones.  (Compl. at 7-8 & Ex. L.)

/////

1    Plaintiff claims that defendants Dr. Mangis and Dr. Roche have been deliberately

2    indifferent to his medical needs in violation of the Eighth Amendment.  Plaintiff requests

3    declaratory relief, injunctive relief, and damages.  (Compl. at 11-12.)

4                  **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

5    Summary judgment is appropriate when it is demonstrated that there exists "no

6    genuine issue as to any material fact and that the moving party is entitled to a judgment as a

7    matter of law."  Fed. R. Civ. P. 56(c).

8    > Under summary judgment practice, the moving party
     > always bears the initial responsibility of informing the district court
9    > of the basis for its motion, and identifying those portions of "the
     > pleadings, depositions, answers to interrogatories, and admissions
10   > on file, together with the affidavits, if any," which it believes
     > demonstrate the absence of a genuine issue of material fact.

11

12   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

13   nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

14   judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

15   to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

16   after adequate time for discovery and upon motion, against a party who fails to make a showing

17   sufficient to establish the existence of an element essential to that party's case, and on which that

18   party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

19   concerning an essential element of the nonmoving party's case necessarily renders all other facts

20   immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

21   whatever is before the district court demonstrates that the standard for entry of summary

22   judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

23    If the moving party meets its initial responsibility, the burden then shifts to the

24   opposing party to establish that a genuine issue as to any material fact actually does exist.  See

25   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

26   establish the existence of this factual dispute, the opposing party may not rely upon the

4

allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

## OTHER APPLICABLE LEGAL STANDARDS

I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes
> to be subjected, any citizen of the United States . . . to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution . . . shall be liable to the party injured in an action at
> law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

II.  The Eighth Amendment and Inadequate Medical Care

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

Where a prisoner's Eighth Amendment claims arise in the context of medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle, 429 U.S. at 106.  An Eighth Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin, 974 F.2d at 1059 (quoting Estelle v. Gamble, 429 U.S. at 104).  Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities."  Id. at 1059-60.  By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference.  Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

1   Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at

2   105-06).  See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere

3   negligence in diagnosing or treating a medical condition, without more, does not violate a

4   prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate

5   indifference is "a state of mind more blameworthy than negligence" and "requires 'more than

6   ordinary lack of due care for the prisoner's interests or safety.'"  Farmer, 511 U.S. at 835

7   (quoting Whitley, 475 U.S. at 319).

8           Delays in providing medical care may manifest deliberate indifference.  Estelle,

9   429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in

10  providing care, a plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d

11  1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332,

12  1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v.

13  Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a]

14  prisoner need not show his harm was substantial; however, such would provide additional

15  support for the inmate's claim that the defendant was deliberately indifferent to his needs."  Jett

16  v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  See also McGuckin, 974 F.2d at 1060.

17          Finally, mere differences of opinion between a prisoner and prison medical staff

18  as to the proper course of treatment for a medical condition do not give rise to a § 1983 claim.

19  Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v.

20  Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir.

21  1981).

22  III.  Qualified Immunity

23           "Government officials enjoy qualified immunity from civil damages unless their

24  conduct violates 'clearly established statutory or constitutional rights of which a reasonable

25  person would have known.'"  Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting

26  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is presented with a qualified

1   immunity defense, the central questions for the court are (1) whether the facts alleged, taken in

2   the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a

3   statutory or constitutional right and (2) whether the right at issue was "clearly established."

4   Saucier v. Katz, 533 U.S. 194, 201 (2001).

5           Although the court was once required to answer these questions in order, the

6   United States Supreme Court has recently held that "while the sequence set forth there is often

7   appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, ___ U.S. ___,

8   ___, 129 S. Ct. 808, 818 (2009). In this regard, if a court decides that plaintiff's allegations do

9   not make out a statutory or constitutional violation, "there is no necessity for further inquiries

10  concerning qualified immunity." Saucier, 533 U.S. at 201. Likewise, if a court determines that

11  the right at issue was not clearly established at the time of the defendant's alleged misconduct,

12  the court may end further inquiries concerning qualified immunity at that point without

13  determining whether the allegations in fact make out a statutory or constitutional violation.

14  Pearson, 129 S. Ct. at 818-21.

15          In deciding whether the plaintiff's rights were clearly established, "[t]he proper

16  inquiry focuses on whether 'it would be clear to a reasonable officer that his conduct was

17  unlawful in the situation he confronted' . . . or whether the state of the law [at the relevant time]

18  gave 'fair warning' to the officials that their conduct was unconstitutional." Clement v. Gomez,

19  298 F.3d 898, 906 (9th Cir. 2002) (quoting Saucier, 533 U.S. at 202). The inquiry must be

20  undertaken in light of the specific context of the case. Saucier, 533 U.S. at 201. Because

21  qualified immunity is an affirmative defense, the burden of proof initially lies with the official

22  asserting the defense. Harlow, 457 U.S. at 812; Houghton v. South, 965 F.2d 1532, 1536 (9th

23  Cir. 1992); Benigni v. City of Hemet, 879 F.2d 473, 479 (9th Cir. 1989).

24  /////

25  /////

26  /////

**DEFENDANT ROCHE'S MOTION FOR SUMMARY JUDGMENT**

I. Defendant Roche's Statement of Undisputed Facts and Evidence

Defendant Roche's statement of undisputed facts is supported by citations to plaintiff's complaint, plaintiff's deposition transcript, and plaintiff's medical records.  It is also supported by citations to the deposition testimony of defendant Drs. Roche and Mangis.

The evidence submitted to the court by defendant Roche establishes the following. On October 29, 2003, correctional officers brought plaintiff to HDSP's Correctional Treatment Center after he complained about kidney stones.  On October 30, 2003, correctional officers brought plaintiff to the yard clinic for a follow-up examination with Dr Mangis who ordered Medical Technical Assistant ("MTA") Barton to perform a preliminary screening.  MTA Barton took a urine sample from plaintiff and performed a blood-sugar test.  Dr. Mangis then asked plaintiff which hospitals he had been admitted to for kidney stones and to describe his current pain.  Plaintiff told him some of the hospitals he had been to but referred Dr. Mangis to his medical file.  Plaintiff also described his pain.  (Def.'s SUDF 4-9 & Ex. B.)

Dr. Mangis conducted a physical examination of plaintiff by squeezing his lower-back region on the left and right sides, determined that plaintiff did not have kidney stones and asked correctional officers to escort plaintiff out of the facility.  Plaintiff claims that Dr. Mangis did not review his medical file in his presence, but he is unsure whether Dr. Mangis reviewed the file at some other time.  Plaintiff alleges that when he asked Dr. Mangis if he was refusing to treat him, Dr. Mangis accused him of putting blood in his urine sample.  (Def.'s SUDF 10-12 & Ex. B.)

In Dr. Mangis' progress note, he wrote that plaintiff complained of pain radiating down into his left leg.  Dr. Mangis also wrote that "[plaintiff] is long on the descriptions of pain and discomfort which do not fit the classical picture."  When asked about plaintiff's visit at his deposition, Dr. Mangis testified as follows:

/////

1   On the date I was seeing him, all the objective findings that I could
2   marshal and that would be available to me as a practicing
    physician, as my state of knowledge then and now and for any
    other reasonable practicing physician, is that there were no kidney
3   stones causing him excessive pain at that time and date.

4   (Def.'s SUDF 13-14 & Exs. D, E.)

5       Defendant Dr. Roche agreed with Dr. Mangis' determination that plaintiff's

6   symptoms did not suggest problematic kidney stones. Dr. Roche testified at his deposition:

7   It's not where you would have pain because of a stone in your
    urethra. I mean it is an area where you could have pain because of
8   a back sprain, for instance. He was tender there where Dr. Mangis
    touched him, that's not consistent – that area is not consistent with
9   [a] kidney stone. It's not where pain radiates because of a kidney
    stone in the ureter.
10

11  (Def.'s SUDF 15 & Ex. C.)

12      Between October 30, 2003, and November 10, 2003, plaintiff alleges that he was

13  in pain. On November 10, 2003, Dr. Mangis examined plaintiff for the second time. Prior to the

14  examination, a nurse took plaintiff's vital signs, including his blood pressure, temperature, and

15  weight. Dr. Mangis then conducted a physical examination by touching plaintiff's left side. Dr.

16  Mangis told plaintiff that he did not have a kidney stone and instructed correctional officers to

17  escort plaintiff out of the treatment area. Plaintiff claims that Dr. Mangis did not review his

18  medical file in his presence, but he does not know whether he consulted it before the visit. In Dr.

19  Mangis' progress note, he wrote that plaintiff had "[n]o sign of actively passing a kidney stone by

20  observation of patient." (Def.'s SUDF 16-17, 19-23 & Exs. B, C, F, G.)

21      Dissatisfied, plaintiff filed an inmate appeal and requested "either I.V.P., x-rays,

22  or ultra sound done to prove I'm telling the truth. Then sent to the urologist who is familiar with

23  me, Dr. Lejunesse to remove the stone." On January 16, 2004, Dr. James interviewed plaintiff as

24  part of the formal level of review of plaintiff's appeal. Prior to this, nurse Clark performed a

25  urinalysis, which was negative for trace amounts of blood. Plaintiff discussed his symptoms with

26  Dr. James and noted that he had been extreme pain, had trouble urinating, and wanted to see his

11

1  outside urologist, Dr. Lajeunesse.  According to plaintiff, Dr. James recommended denying

2  plaintiff's appeal because there was no blood in his urine.  He also recommended that plaintiff

3  drink a lot of water.  On January 28, 2004, Dr. Roche issued a written response to plaintiff's

4  appeal, adopting Dr. James' recommendation to deny the appeal at the formal level of review.  In

5  pertinent part, Dr. Roche's response to plaintiff stated:

6          there is no current evidence that [plaintiff] has kidney stones or a
        bladder infection.  Based on this there is no urgent need for further

7          investigation.  You will be ducated back to the clinic in one month
        to monitor your condition.

8

9  (Def.'s SUDF 17, 30-35 & Exs. B, G.)

10          In denying plaintiff's appeal, Dr. Roche considered plaintiff's entire medical file

11  available at the prison.  At his deposition, Dr. Roche testified that the mere fact that plaintiff may

12  have had blood in his urine did not mean that he had problematic kidney stones and that

13  plaintiff's description of his pain did not correspond with pain from kidney stones.  Dr. Roche

14  determined that there was no medically justifiable reason to order the tests plaintiff requested and

15  concluded that an attempt by an inmate to prove the truth of his allegations of pain through tests

16  is not an appropriate basis on which to grant an appeal.[2]  (Def.'s SUDF 24-28 & Exs. C, G.)

17          On March 3, 2004, plaintiff saw Dr. James again.  Dr. James asked plaintiff about

18  his pain, performed a urinalysis, and read some of plaintiff's medical file.  Dr. James then

19  recommended that plaintiff see his outside urologist Dr. Lajeunesse.  The Medical Authorization

20

21      [2]  Dr. Roche reviewed plaintiff's inmate appeal on two occasions.  In December 2003, Dr.
Roche received plaintiff's appeal and wrote a brief note at the bottom.  The court's copies of the

22  note are illegible and appear to have been cut-off during the copying process.  However, during
plaintiff's deposition, defense counsel asked plaintiff about the same appeal.  Plaintiff read

23  defendant Roche's note as stating:  "Received patient's charts PM's and history including
numerous x-rays and procedures, there is insufficient documentation to treat as an emergency or
to treat with emergency intervention at this time."  (Pl.'s Dep. at 123.)  Contrary to the indication

24  in defendant's separate statement of undisputed material facts, it appears that Dr. Roche reviewed
plaintiff's inmate appeal in December 2003 only to determine whether it should be processed as

25  an emergency appeal.  Dr. Roche did not reach the merits of the appeal.  In January 2004, Dr.
Roche decided the merits of the appeal.  He issued the written response described above denying

26  the appeal at the formal level of review.

1  Review Committee approved Dr. James' recommendation and forwarded the matter to the

2  Specialty Clinic for scheduling to occur within 60-90 days.  (Def.'s SUDF 37-39 & Ex. B.)

3       On May 1 or 2, 2004, plaintiff passed a kidney stone.  He submitted a sick-call

4  slip to notify prison officials of the incident.  A nurse responded to the sick-call slip and told

5  plaintiff to hold onto the stone because he was already scheduled to see his outside urologist.  On

6  May 10, 2004, plaintiff saw Dr. Lajeunesse and provided her the stone for analysis.  (Def.'s

7  SUDF 40-41 & Ex. B.)

8       On June 15, 2004, plaintiff had his first physical contact with defendant Roche.

9  Plaintiff alleges that at that time he was laying on his cell floor curled in a ball in pain with blood

10  dripping from his penis.  Correctional officers escorted him to the Correctional Treatment

11  Center.  Once there, a nurse took his vital signs and gave him a shot of Toradol.  Dr. Roche

12  informed plaintiff that he would be transported to see Dr. Lajuenesse for treatment.  On the

13  following day, Dr. Lajuenesse dilated plaintiff's urethra, enabling him to pass another kidney

14  stone.  When plaintiff returned to HDSP and informed Dr. Roche of the procedure that he had

15  undergone, Dr. Roche merely responded by stating that the procedure could have been performed

16  in-house.  Plaintiff never came into physical contact with Dr. Roche again after June 16, 2004.

17  (Def.'s SUDF 42-47, 49 & Ex. B.)

18       On July 22, 2004, Dr. Roche approved Dr. Lajeunesse's recommendation for

19  surgery.  On the following day, plaintiff was in his cell curled in a ball in pain again.

20  Correctional officers escorted him to the Correctional Treatment Center, and Nurse Kincaid took

21  his vital signs.  Plaintiff discussed his symptoms with Nurse Kincaid and requested a shot to

22  alleviate his pain.  Dr. Roche denied plaintiff's request over the telephone, asserting that he was

23  aware plaintiff had kidney stones but that plaintiff was scheduled for surgery soon and should

24  drink water instead.  The next day, plaintiff's pain abated somewhat and stayed that way until his

25  surgery on August 3, 2004.  On August 19, 2004, after plaintiff's stints were removed following

26  /////

1   his surgery, he no longer had pain associated with his kidneys or ureter, or during urination.

2   Plaintiff eventually made a complete recovery.  (Def.'s SUDF 50-58 & Exs. B, I, J.)

3   II.  Defendant Roche's Arguments

4           Defense counsel argues that Dr. Roche is entitled to summary judgment in his

5   favor on plaintiff's Eighth Amendment claims.  Specifically, counsel argues that, from October

6   2003, through February 2004, Dr. Roche was not aware that plaintiff's medical condition was

7   objectively serious, and in fact, plaintiff's medical condition was not objectively serious.  (Def.'s

8   Mem. of P. & A. at 9.)

9           On January 24, 2004, Dr. Roche issued a written response denying plaintiff's

10  inmate appeal, explaining that he reviewed plaintiff's medical history.  On December 15, 2003,

11  plaintiff's urinalysis showed a specific gravity within normal range.  In addition, plaintiff's urine

12  dip test showed no blood or white blood cells present.  Dr. Roche concluded that there was no

13  urgent need for further investigation, but he left open the possibility that plaintiff would need

14  future medical care and informed him that he would be ducated back to the clinic in one month to

15  monitor his condition.  Counsel argues that, as of January 24, 2003, there was insufficient

16  evidence to indicate that plaintiff needed urgent medical care.  (Def.'s Mem. of P. & A. at 9-10.)

17          In March 2003, plaintiff visited Dr. James and presented symptoms indicative of

18  problematic kidney stones.  Dr. James recommended that plaintiff see an outside specialist, and

19  the medical review committee approved the referral.  In mid-June, Dr. Roche briefly saw plaintiff

20  before he went to see the specialist.  Then, in late July, the day after Dr. Roche approved plaintiff

21  for surgery in early August, plaintiff wanted something for pain, and Dr. Roche prescribed water.

22  Plaintiff admits that his pain subsided somewhat the following day.  (Def.'s Mem. of P. & A. at

23  10.)

24          Defense counsel argues that there is no evidence that Dr. Roche caused any delays

25  in plaintiff's treatment.  Moreover, counsel argues that a mere difference of opinion between a

26  prisoner and doctors regarding the appropriate course of treatment is an insufficient basis on

which to state an Eighth Amendment claim.  Here, Dr. Roche reviewed plaintiff's medical

history and found that the treatment he requested was not medically justified.  Several other

doctors concurred with him.  The fact that later in time, under different circumstances, treatment

was recommended does not undermine Dr. Roche's initial position.  According to defense

counsel, Dr. Roche's behavior was deliberate and justified, as evidenced by the fact that he

concurred with Drs. Mangis and James' opinions.  In this regard, counsel maintains that Dr.

Roche did not possess the requisite state of mind to violate plaintiff's rights under the Eighth

Amendment.  (Def.'s Mem. of P. & A. at 10-11.)

Defense counsel also argues that there is no respondeat superior liability under

§ 1983, so to the extent that defendant Mangis may have violated plaintiff's rights, defendant

Roche should not be held responsible.  Counsel further argues that Dr. Roche's review and denial

of plaintiff's inmate appeal cannot serve as a basis for liability.  In fact, counsel notes that in

denying plaintiff's appeal, Dr. Roche actually called for continued monitoring of plaintiff's

condition.  (Def.'s Mem. of P. & A. at 11-12.)

Finally, defense counsel argues that Dr. Roche is entitled to qualified immunity

because a reasonable official in the defendant's position would have believed his conduct was

lawful.  Specifically, counsel argues, Dr. Roche followed the well-reasoned opinions of Drs.

Mangis and James in denying plaintiff's requests for relief.  (Def.'s Mem. of P. & A. at 12-13.)

III.  Plaintiff's Opposition

Plaintiff's opposition to defendant Roche's motion for summary judgment is

supported by a response to the statement of undisputed facts submitted on behalf of defendant

Roche and plaintiff's separate statement of disputed facts.  It is also supported by citations to

plaintiff's deposition testimony, plaintiff's medical records, and defendant Roche's deposition

testimony.

Counsel for plaintiff argues that there is a genuine issue of material fact as to

whether defendant Roche was deliberately indifferent to plaintiff's serious medical needs.  By

1   way of background, counsel explains that plaintiff has had a long history of kidney stones

2   involving approximately 40 kidney and urinary tract stones since 1991.  Plaintiff has been

3   hospitalized and has undergone surgery for the stones on several occasions.  On October 29,

4   2003, plaintiff went to HDSP's emergency room complaining of left flank pain that radiated to

5   the left side of his abdomen.  Plaintiff received pain medication and subsequently a ducat to go to

6   the yard clinic the next day.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 2-4, 6 & Pl.'s Dep. at

7   10-25, 43-45.)

8           On October 30, 2003, plaintiff went to the yard clinic and submitted a urine

9   sample to the nurse that contained trace amounts of blood.  He also completed a blood sugar

10  finger-stick test.  When plaintiff saw Dr. Mangis, the doctor refused to open plaintiff's medical

11  file and accused him of drug-seeking.  Dr. Mangis squeezed plaintiff's left side so hard that it

12  caused plaintiff excruciating pain and the doctor then proclaimed plaintiff stone free without

13  further testing.  Plaintiff was unable to urinate for 18 hours after this visit.  (Pl.'s Opp'n to Def.'s

14  Mot. for Summ. J. at 4-5 & Pl.'s Dep. at 54-67.)

15          Between October 30, 2003, and November 10, 2003, plaintiff submitted an

16  estimated five or six sick-call slips.  On November 10, 2003, he saw Dr. Mangis a second time.

17  Again, Dr. Mangis labeled plaintiff a drug-seeker and did not conduct any tests or diagnose

18  plaintiff's recurrence of kidney stones.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 6 & Pl.'s

19  Dep. at 71, 73-84.)

20          On November 10, 2003, plaintiff began filing inmate appeals regarding his kidney

21  stones and Dr. Mangis' alleged conduct.  Defendant Roche, in his capacity as the Chief Physician

22  and Surgeon, denied plaintiff's appeal.  Plaintiff's counsel contends, however, that Carol Leo, the

23  Appeals Coordinator at HDSP, actually prepared Dr. Roche's response.  Defendant Roche did

24  not review plaintiff's medical record nor did he know anything about Ms. Leo or her

25  qualifications to review a medical record.  Moreover, Dr. Roche made no effort to speak with

26  plaintiff to assess his pain even though Dr. Roche conceded that it was possible that a kidney

1   stone was the cause of plaintiff's pain.  Instead, Dr. Roche mis-characterized plaintiff's request

2   for diagnostic tests, claiming that plaintiff wanted an ultrasound or x-ray simply to prove that he

3   was telling the truth about his kidney stones.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 5-8 &

4   Def.'s Dep. at 62-65.)

5           On March 3, 2004, Dr. James recommended that plaintiff see Dr. Lajeunesse for a

6   consultation for possible urethral stricture.  On May 10, 2004, plaintiff saw Dr. Lajeunesse who

7   ordered a CT scan on the same day, revealing that plaintiff had three kidney stones in his right

8   kidney and one kidney stone in his left kidney.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 8 &

9   Exs. F, K.)

10          On July 23, 2004, plaintiff was in extreme pain and was unable to urinate.  He

11  went to HDSP's emergency room and saw Nurse Kincaid.  He discussed his symptoms with her

12  and told her that he had just returned from an outside hospital after having a KUB X-ray and

13  seeing Dr. Lajeunesse.  Plaintiff requested pain medication, and Nurse Kincaid telephoned Dr.

14  Roche to get an order.  Dr. Roche, however, refused to order the pain medication and instead,

15  indicated that plaintiff should drink more water since he was scheduled for surgery soon.  On

16  August 3, 2004, plaintiff underwent surgery to remove or treat the kidney stones thereby

17  relieving him of his pain.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 8 & Pl.'s Dep. at 139-42.)

18          Counsel for plaintiff argues that Dr. Roche is responsible for the seven-month

19  delay plaintiff experienced before seeing Dr. Lajeunesse for actual treatment.  Counsel contends

20  that Dr. Roche reviewed plaintiff's inmate appeal requesting diagnostic tests, but he failed to

21  review plaintiff's medical chart or see plaintiff to speak with him about his pain.  Instead, Dr.

22  Roche relied on the Appeals Coordinator without knowing whether she had any medical

23  background whatsoever.  Dr. Roche knew that Dr. Mangis had not completed an informal level

24  of review of plaintiff's appeal as he was supposed to do.  In this regard, plaintiff's counsel

25  contends that Dr. Roche had a heightened obligation to conduct a thorough review of the appeal

26  /////

17

1    and potentially meet with plaintiff given this knowledge.  (Pl.'s Opp'n to Def.'s Mot. for Summ.

2    J. at 11-12 & Def.'s Dep. at 35-36.)

3              Plaintiff's counsel also argues that Dr. Roche knew that kidney stone pain could

4    be severe at the time he reviewed plaintiff's inmate appeal.  In addition, he knew or strongly

5    suspected plaintiff had a recurrence of kidney stones.  Plaintiff's counsel argues that, by failing to

6    authorize diagnostic tests to determine whether plaintiff was suffering from a recurrence of

7    kidney stones, Dr. Roche knew of and disregarded the risks to plaintiff's health and knew that

8    plaintiff would continue to suffer severe pain.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 12-13

9    & Def.'s Dep. at 39.)

10             Finally, plaintiff's counsel argues that Dr. Roche is not entitled to qualified

11   immunity.  Counsel points out that a prisoner's right to adequate medical care is well established.

12   Here, he contends, plaintiff did not receive necessary diagnostic tests for seven months.  He did

13   not receive a referral to his urologist, and he only received Tylenol for his extreme pain.  Counsel

14   argues that Dr. Roche acted unreasonably by not promptly authorizing necessary diagnostic tests

15   for plaintiff and by not promptly providing him with a referral to see Dr. Lajeunesse.  Counsel

16   also argues that Dr. Roche acted unreasonably when he processed plaintiff's appeal without

17   speaking to him or examining him or his medical record.  Finally, counsel argues that Dr. Roche

18   acted unreasonably on July 23, 2004, when he denied plaintiff pain medication and instead told

19   him to drink water without speaking to him or examining him.  (Pl.'s Opp'n to Def.'s Mot. for

20   Summ. J. at 13-15.)

21   IV.  Defendant Roche's Reply

22             In reply, defense counsel argues that plaintiff's opposition fails to distinguish

23   between the mere existence of kidney stones and problematic kidney stones.  Problematic kidney

24   stones warrant treatment, but inactive kidney stones are often innocuous and not readily

25   susceptible to treatment.  Defense counsel contends that in October 2003, Dr. Roche was aware

26   of plaintiff's lengthy history with kidney stones.  However, plaintiff's history in and of itself did

1  not justify the diagnostic tests he requested.  Plaintiff's presenting symptoms did not correspond

2  with problematic kidney stones, so Dr. Roche reasonably concluded that there was no medically

3  justifiable reason to order diagnostic x-rays or an ultrasound.  (Def.'s Reply at 1-2.)

4          Moreover, defense counsel contends that Dr. Roche reviewed plaintiff's entire

5  medical chart, including notes from plaintiff's treating physician before he denied plaintiff's

6  inmate appeal.  In this regard, counsel contends that Dr. Roche made an informed decision to

7  deny plaintiff's requested relief and also scheduled plaintiff for further monitoring of his

8  condition.  According to defense counsel, Dr. Roche's conduct shows that he cared about

9  plaintiff's health and was open to the possibility that plaintiff may require further examination or

10  treatment in the future.  (Def.'s Reply at 2.)

11          Defense counsel also argues that plaintiff's opposition attempts but fails to raise

12  six triable issues of fact.  First, plaintiff argues that Dr. Roche mis-characterized his motive for

13  requesting diagnostic tests as a truth-telling exercise.  However, plaintiff's inmate appeal literally

14  requested diagnostic tests so that plaintiff could prove he was "telling the truth."  In addition,

15  although Dr. Roche determined that plaintiff's requests for relief were inappropriate because

16  diagnostic tests are not performed on inmates to prove that they are telling the truth, he also

17  determined that plaintiff's presenting symptoms did not correspond with the diagnostic tests he

18  requested.  (Def.'s Reply at 3.)

19          Second, plaintiff argues that Dr. Roche did not review his medical file before

20  denying his request for diagnostic tests.  However, this contention is false because, as defendant

21  Roche testified at his deposition:

22          Well, as I - my note says, I reviewed the entire chart which
          includes nursing notes, progress notes which also include nursing
23          notes.  It's not just Dr. Mangis's notes, it would have been other
          doctors and nurses who have seen him or would have reviewed
24          myself his x-rays, his blood work, whatever kind of procedures he
          had had beforehand.

25

26  (Def.'s Reply at 3-4.)

1    Third, plaintiff argues that Dr. Roche made no effort to speak with him before

2    denying his requests for relief.  However, Dr. Roche had sufficient information to respond to

3    plaintiff's appeal.  Plaintiff presents no authority that requires Dr. Roche to interview inmates

4    pursuing appeals.  Moreover, Dr. Roche ordered future monitoring of plaintiff's condition to

5    ensure he received any necessary treatment.  (Def.'s Reply at 4.)

6    Fourth, plaintiff argues that Dr. Roche did not prepare his response to plaintiff's

7    appeal; instead Carol Leo, an Appeals Coordinator, prepared it.  However, Ms. Leo performed

8    the administrative function of drafting Dr. Roche's response.  Defendant Roche approved its

9    content based on his opinions.  (Def.'s Reply at 4.)

10    Fifth, plaintiff argues that Dr. Roche denied plaintiff medication on July 23, 2004,

11    even though plaintiff presented with pain associated with problematic kidney stones.  However,

12    based on the information that Dr. Roche received, he concluded that a shot was not warranted.

13    Moreover, plaintiff's pain subsided the following day.  (Def.'s Reply at 4.)

14    Sixth, plaintiff argues that Dr. Mangis did not complete the informal level of

15    review of plaintiff's inmate appeal.  However, Dr. Mangis' failure to do so is irrelevant as to

16    whether Dr. Roche acted with deliberate indifference.  In denying plaintiff's inmate appeal, Dr.

17    Roche relied on plaintiff's medical file and the written memorandum by Dr. Mangis regarding

18    his examination of plaintiff.  (Def.'s Reply at 4-5.)

19    Finally, defense counsel argues that plaintiff misstates the qualified immunity

20    standard.  Plaintiff argues that the qualified immunity analysis comes down to whether Dr. Roche

21    acted reasonably.  Qualified immunity, however, is a two-part inquiry: (1) was the law governing

22    the state official's conduct clearly established, and (2) under that law, could a reasonable state

23    official have believed his conduct was lawful.  The second prong does not involve an analysis of

24    whether the defendant's conduct was reasonable.  Rather, it asks whether a reasonable state

25    official could have believed defendant Roche's conduct was lawful.  Again, for the reasons

26    /////

1   discussed above, defense counsel argues that a reasonable official would have believed Dr.

2   Roche's conduct was lawful.  (Def.'s Reply at 5.)

**ANALYSIS**

3

4   I.  Plaintiff's Serious Medical Needs

5           The undersigned concludes that based upon the evidence presented by the parties

6   in connection with the pending motion a reasonable juror could conclude that plaintiff's recurring

7   kidney stones and related pain constitute objective, serious medical needs.  See McGuckin, 974

8   F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find

9   important and worthy of comment or treatment; the presence of a medical condition that

10  significantly affects an individual's daily activities; or the existence of chronic and substantial

11  pain are examples of indications that a prisoner has a 'serious' need for medical treatment."); see

12  also Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth Amendment duty to

13  provide medical care applies "to medical conditions that may result in pain and suffering which

14  serve no legitimate penological purpose.").  Specifically, plaintiff's long and largely undisputed

15  medical history demonstrates that a failure to treat him could result in "further significant injury"

16  and the "unnecessary and wanton infliction of pain."  See, e.g., McGuckin, 974 F.2d at 1059.

17  Accordingly, defendant Roche's motion for summary judgment hinges on whether, based upon

18  the evidence before the court, a rationale jury could conclude that defendant Roche responded to

19  plaintiff's serious medical needs with deliberate indifference.  Farmer, 511 U.S. at 834; Estelle,

20  429 U.S. at 106.

21  II.  Defendant Roche's Response to Plaintiff's Serious Medical Needs

22          The court finds that defendant Roche has borne his initial responsibility of

23  demonstrating that there is no genuine issue of material fact with respect to the adequacy of the

24  medical care provided to plaintiff.  Defendant's evidence demonstrates that, on January 28, 2004,

25  he issued a written response denying plaintiff's inmate appeal.  Therein, defendant Roche

26  adopted Dr. James' findings and recommendations, which were based on an interview he had

1   with plaintiff.  Specifically, Dr. James stated that there was no current evidence that plaintiff had

2   kidney stones.  Plaintiff's urinalysis and urine dip test were normal.  Dr. Roche concluded that

3   "there is no urgent need for further investigation" and informed plaintiff that he would be

4   ducated back to the clinic in one month to monitor his condition.  (Def.'s Ex. G.)

5       In denying plaintiff's appeal, Dr. Roche considered plaintiff's entire medical file

6   available at the prison, including defendant Mangis' notes, other doctors' and nurses' notes,

7   progress notes, and diagnostic and medical tests plaintiff previously underwent.  Defendant

8   Roche agreed with the determination by Dr. Mangis that plaintiff's symptoms did not suggest

9   problematic kidney stones.  (Def.'s Ex. C.)

10      On June 15, 2004, Dr. Roche had his first physical contact with plaintiff.  He

11  informed plaintiff that he would be transported to see his Dr. Lajuenesse for treatment.  On the

12  following day, Dr. Lajuenesse dilated plaintiff's urethra, enabling him to pass a kidney stone.

13  When plaintiff returned to HDSP, he informed Dr. Roche of the procedure that was performed.

14  After June 16, 2004, plaintiff never came into physical contact again with Dr. Roche.  (Def.'s Ex.

15  B.)

16      On July 22, 2004, Dr. Roche approved Dr. Lajeunesse's recommendation for

17  surgery for plaintiff.  On July 23, 2004, plaintiff requested a shot to alleviate kidney stone related

18  pain, but Dr. Roche denied the request over the telephone and told him to drink water instead.

19  The next day, plaintiff's pain abated somewhat and stayed that way until his surgery on August 3,

20  2004.  (Def.'s Exs. B, I, J.)  Given this evidence, the burden shifts to plaintiff to establish the

21  existence of a genuine issue of material fact with respect to his deliberate indifference claim.

22      The court finds that a reasonable juror could conclude that defendant Roche

23  responded to plaintiff's serious medical needs with deliberate indifference.  Farmer, 511 U.S. at

24  834; Estelle, 429 U.S. at 106.  In so concluding, the court has considered plaintiff's opposition to

25  the pending motion for summary judgement, his sworn deposition testimony, and his verified

26  complaint.  In considering defendant Roche's motion for summary judgment, the court is

1   required to believe plaintiff's evidence and draw all reasonable inferences from the facts before

2   the court in plaintiff's favor.  Drawing all reasonable inferences from the evidence submitted in

3   plaintiff's favor, the court finds that plaintiff has submitted sufficient evidence to create a

4   genuine issue of material fact precluding summary judgment in favor of defendant Roche.

5          Defense counsel argues that Dr. Roche did not act or fail to act with the requisite

6   state of mind to violate plaintiff's rights under the Eighth Amendment.  However, this court

7   cannot grant defendant's motion for summary judgment simply based on his assertion as to his

8   own state of mind.  As the Ninth Circuit recently has explained:

9          Proof of "subjective awareness" is not limited to the purported
           recollections of the individuals involved.  "Whether an official had
10         the requisite knowledge of a substantial risk is a question of fact
           subject to demonstration in the usual ways, including inference
11         from circumstantial evidence."  Indeed, in certain circumstances,
           "a factfinder may conclude that [an] official knew of a substantial
12         risk from the very fact that the risk was obvious. . . ."

13                              * * *

14         "[Q]uestions involving a person's state of mind are generally
           factual issues inappropriate for resolution by summary judgment."
15         We, of course, "may not make credibility determinations or weigh
           conflicting evidence."  (internal citations omitted)

16

17   Conn v. City of Reno, __ F.3d __, __, 2009 WL 2195338 at *7 & *9 (9th Cir. July 24, 2009).

18          In this case, plaintiff has a long and largely undisputed medical history of

19   recurring kidney stones.  Plaintiff's evidence establishes that, as early as June 1991, he was

20   hospitalized overnight for kidney stone related pain.  In the two years that followed, plaintiff was

21   hospitalized on several other occasions for the same reason.  At times, plaintiff experienced

22   bleeding, blood in his urine and pain.  In February 1993, plaintiff underwent his first surgery for

23   kidney stones.  In the ensuing years through 1998, plaintiff was hospitalized on several more

24   occasions and passed at least two kidney stones.  From 1998 through early 2002, plaintiff did not

25   have any active kidney stones.  However, in May 2002, plaintiff underwent his second surgery

26   for kidney stones.  Dr. Lajeunesse performed the surgery and explained in her operative report

1   that "[plaintiff] is at significant risk for recurrence of his stricture and will need to be followed

2   closely and may require intermittent dilatations."  In December of 2002, Dr. Weaver at HDSP

3   treated plaintiff for kidney stones again.  Up to that point, each time plaintiff received medical

4   care for kidney stones and kidney stone related pain, he received pain medication, including

5   Toradol or Morphine.  (Pl.'s Dep. at 11-17, 21, 24 & Compl. Ex. G.)

6              Dr. Roche acknowledges that he was aware of plaintiff's medical history with

7   respect to his kidney stones.  Dr. Roche also acknowledges that, before he issued his written

8   response denying plaintiff's inmate appeal, he reviewed plaintiff's entire medical record,

9   including defendant Mangis' notes, other doctors' and nurses' notes, progress notes, and

10  diagnostic and medical tests plaintiff previously underwent.  Finally, Dr. Roche acknowledges

11  that plaintiff complained about kidney stones and kidney stone related pain in his inmate appeal

12  and on July 23, 2004, in HDSP's Correctional Treatment Center.  (Def.'s Dep. at 41, 67 & Def.'s

13  Exs. G, J.)  Given this evidence, a reasonable juror could conclude that plaintiff's medical needs

14  were so obvious that defendant Roche should have been aware of the substantial risk of injury or

15  harm to him.

16             Defense counsel also argues that a mere difference of opinion between a prisoner

17  and medical staff about the appropriate treatment is an insufficient basis on which to state an

18  Eighth Amendment claim.  Defense counsel is correct that a mere difference of opinion between

19  a prisoner and prison medical staff does not give rise to a § 1983 claim.  Toguchi, 391 F.3d at

20  1058; Jackson, 90 F.3d at 332; see also Fleming v. Lefevere, 423 F. Supp. 2d 1064, 1070 (C.D.

21  Cal. 2006) ("Plaintiff's own opinion as to the appropriate course of care does not create a triable

22  issue of fact because he has not shown that he has any medical training or expertise upon which

23  to base such an opinion.").  Likewise, a difference of medical opinion between doctors does not

24  give rise to a constitutional violation.  See, e.g., Toguchi, 391 F.3d at 1059-60 ("Dr. Tackett's

25  contrary view was a difference of medical opinion, which cannot support a claim of deliberate

26  indifference."); Sanchez, 891 F.2d at 242 (difference of opinion between medical personnel

regarding the need for surgery does not amount to deliberate indifference to a prisoner's serious medical needs).  However, the evidence before the court indicates that this case may involve more than a mere difference of opinion over the appropriate course of treatment.

In the undersigned's view, the instant case is akin to cases where prison officials and doctors deliberately ignore the express orders of a prisoner's prior physician.  See Jett, 439 F.3d at 1097-98 (finding a triable issue of fact as to whether a prison doctor was deliberately indifferent to a prisoner's medical needs when he decided not to request an orthopedic consultation as the prisoner's emergency room doctor had previously ordered); Hamilton v. Endell, 981 F.2d 1062, 1067 (9th Cir. 1992) (finding a triable issue of fact as to whether prison officials were deliberately indifferent to prisoner's serious medical needs when they relied on the opinion of a prison doctor instead of the opinion of the prisoner's treating physician and surgeon), abrogated in part on other grounds by Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1045 (9th Cir. 2002); see also Estelle, 429 U.S. at 104-05 (holding that deliberate indifference may manifest "by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed"); Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000) (holding that a prisoner may establish deliberate indifference by showing that a prison official intentionally interfered with his medical treatment); Wakefield v. Thompson, 177 F.3d 1160, 1165 & n.6 (9th Cir. 1999) (holding that "a prison official acts with deliberate indifference when he ignores the instructions of the prisoner's treating physician or surgeon.").

On November 10, 2003, November 25, 2003, and December 10, 2003, plaintiff submitted the same inmate appeal to prison officials because they had failed to respond to it on previous occasions.  Therein, plaintiff explained that he saw defendant Dr. Mangis twice regarding a kidney stone that was stuck and causing him pain and hindering his ability to urinate. He further explained that his medical records showed that he had a long history of kidney stones and that the year before Dr. Lajeunesse surgically-removed kidney stones.  Plaintiff requested

1   specific diagnostic tests and a referral to see Dr. Lajeunesse.  As noted above, Dr. Lajeunesse had

2   previously treated plaintiff for kidney stones and performed surgery on him.  She explained in

3   her operative report that "[plaintiff] is at significant risk for recurrence of his stricture and will

4   need to be followed closely and may require intermittent dilatations."  (Compl. Ex. G.)

5          Defendant Roche reviewed plaintiff's inmate appeal and requests for medical care

6   on two occasions.  On December 12, 2003, defendant Dr. Roche rejected plaintiff's request to

7   treat his inmate appeal as an emergency appeal.  On January 28, 2004, Dr. Roche issued a written

8   response to plaintiff's inmate appeal denying his requests for relief.  In so doing, defendant

9   Roche adopted the findings of Drs. Mangis and James and concluded that "there is no urgent

10  need for further investigation."  (Def.'s Ex. G.)

11         Dr. Roche testified at his deposition that he reviewed plaintiff's entire medical

12  chart before he denied the appeal.  (Def.'s Dep. at 41.)  Thus, Dr. Roche was aware of the

13  opinions of Drs. Mangis and James that plaintiff did not need further diagnostic tests or treatment

14  as well as Dr. Lajeunesse's opinion that plaintiff was at significant risk for recurrence of his

15  stricture, would need to be followed closely, and might require intermittent dilatations.  Where,

16  as here, Dr. Roche had conflicting medical opinions to consider, the relevant inquiry is whether

17  the defendant was entitled to rely on the opinions of Drs. Mangis and James knowing what he

18  knew about plaintiff's medical condition and the merits of the various medical opinions.

19  Hamilton, 981 F.2d at 1067.

20         On the one hand, Dr. Lajeunesse is plaintiff's urologist and surgeon.  She treated

21  plaintiff on previous occasions for kidney stones and performed surgery on him.  (Def.'s Ex. H,

22  Compl. Ex. G.)  On the other hand, Dr. Mangis was a contract physician for HDSP.  He had not

23  seen or treated plaintiff until October 30, 2003, and November 10, 2003.  Moreover, plaintiff

24  repeatedly complained that Dr. Mangis refused to examine him or adequately treat him for

25  kidney stones and submitted five or six sick-call slips seeking additional treatment.  Dr. James'

26  interaction with plaintiff was similarly limited.  He saw plaintiff on January 16, 2004, in response

1  to plaintiff's inmate appeal.  Dr. James did not examine plaintiff or touch him at all.  He only

2  asked plaintiff for a urine sample, which contained no trace amounts of blood.  (Def.'s Exs. E, F,

3  G & Pl.'s Dep. at 86-88.)

4          By adopting the findings of Drs. Mangis and James, defendant Roche relied on the

5  arguably inferior medical opinions.  See Hamilton, 981 F.2d at 1067 ("By choosing to rely upon

6  a medical opinion which a reasonable person would likely determine to be inferior, the prison

7  officials took actions which may have amounted to the denial of medical treatment, and the

8  'unnecessary and wanton infliction of pain.'").  Dr. Roche had the authority and multiple

9  opportunities to procure the medical treatment plaintiff sought and appears to have needed under

10 one view of the evidence.  However, a rationale juror could find based upon the evidence

11 submitted to the court that defendant Roche ignored plaintiff's repeated complaints about kidney

12 stones and kidney stone related pain as well as plaintiff's lengthy history of kidney stones and his

13 urologist's medical opinion.  See Jett, 439 F.3d at 1098 ("prison administrators . . . are liable for

14 deliberate indifference when they knowingly fail to respond to an inmate's requests for help.");

15 see also See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for

16 constitutional violations of his subordinates if the supervisor participated in or directed the

17 violations, or knew of the violations and failed to act to prevent them.").  Given the evidence

18 before the court on summary judgment, a reasonable juror could conclude that defendant Roche

19 responded to plaintiff's serious medical needs with deliberate indifference.[3]

20

---

21      [3]  The court also notes that Dr. Roche denied plaintiff's requests for medical treatment
22 based, in part, on Dr. James' observation that plaintiff's urinalysis and urine dip test were
   normal.  However, Dr. Roche himself now appears to dismiss the presence of or lack of blood in
23 urine as evidence of a kidney stone.  In this regard, at his deposition, Dr. Roche testified that:

24          a number of people walk around with kidney stones that are totally
           asymptomatic, and so having – having blood in your urine is not a
25          diagnosis of a kidney stone.  Not having blood in your urine is not
           a diagnosis of a kidney stone.

26 (Def. Roche Dep. at 46.)

1      Finally, defense counsel argues that Dr. Roche's decision to deny plaintiff

2 treatment is not undermined by the fact that plaintiff ultimately received medical treatment for a

3 recurrence of kidney stones.  Defense counsel contends that prison officials later recommended

4 plaintiff for treatment "under different circumstances."  However, it is not at all clear from

5 defense counsel's argument or the evidence before the court that prison officials made their

6 subsequent recommendation under different circumstances at all.  On January 16, 2004, Dr.

7 James indicated that plaintiff did not require additional diagnostic tests or medical treatment

8 because his urinalysis was normal and his urine dip test showed no blood or white blood cells

9 present.  (Def.'s Ex. G.)  Less than two months later, however, Dr. James recommended that

10 plaintiff see Dr. Lajeunesse.  Dr. James did not appear to base his subsequent recommendation

11 on a new urinalysis or a diagnostic test.  In fact, plaintiff's urinalysis at the time of Dr. James'

12 subsequent referral was also negative for trace amounts of blood.  Rather, Dr. James appears to

13 have based his subsequent recommendation on a review of plaintiff's existing medical records,

14 specifically, Dr. Lajeunesse's opinion that plaintiff was at significant risk for recurrence of his

15 stricture, would need to be followed closely, and might require intermittent dilatations.  (Pl.'s

16 Dep. at 90-92 & Compl. Ex. G.)

17      Moreover, even after Dr. James recommended that plaintiff see Dr. Lajeunesse,

18 defendant Roche still denied plaintiff medical treatment in the form of pain management even

19 though he acknowledged that kidney stone related pain can be severe.  (Def.'s Dep. at 39.)

20 Specifically, there is evidence before the court that on July 23, 2004, plaintiff was in his cell

21 curled in a ball in pain.  Correctional officers escorted him to the Correctional Treatment Center,

22 and Nurse Kincaid took his vital signs.  Plaintiff discussed his symptoms with Nurse Kincaid and

23 requested a shot to alleviate his pain.  As noted above, Dr. Roche denied plaintiff's request over

24 the telephone, asserting that he was aware plaintiff had kidney stones but that plaintiff was

25 scheduled for surgery soon and should drink water instead.  (Pl.'s Dep. at 101-102.)

26 /////

It is undisputed that at the time Dr. Roche denied plaintiff's request he was aware that plaintiff was experiencing a recurrence of kidney stones.  In May 2004, plaintiff had passed a kidney stone.  On May 10, 2004, plaintiff saw Dr. Lajeunesse, and on the same day she ordered a CT-scan.  The scan revealed that plaintiff had three kidney stones in his right kidney and one kidney stone in his left kidney.  Subsequently, on June 15, 2004, plaintiff was laying on his cell floor curled in a ball in pain with blood dripping from his penis.  Correctional officers escorted him to the Correctional Treatment Center.  Plaintiff was sweating profusely, and his eyes were closed.  His head was buried in his knees, and he was yelling for a shot.  Correctional officers picked up plaintiff out of his wheelchair and put him on the examining table.  A nurse took his vital signs and gave him a shot of Toradol.  Dr. Roche then entered the room and informed plaintiff that he would be emergency transported to see Dr. Lajuenesse for treatment.  Dr. Roche did not examine plaintiff or touch him at all.  The next day, Dr. Lajuenesse dilated plaintiff's urethra, enabling him to pass another kidney stone.  When plaintiff returned to HDSP, he informed Dr. Roche of the procedure that had been performed and Dr. Roche merely responded by stating that it could have been performed in-house.  Finally, on July 22, 2004, the day before denying plaintiff's request for pain management, Dr. Roche had approved Dr. Lajuenesse's recommendation for surgery.  Plaintiff was not scheduled for surgery, however, until August 3, 2004.  (Pl.'s Dep. at 92-93, 101-115, Compl. Ex. I.)

Thus, notwithstanding plaintiff's long and largely undisputed medical history of suffering with recurring kidney stones, as well as defendant Roche's own awareness that plaintiff was experiencing a recurrence of kidney stones, Dr. Roche denied plaintiff pain medication and instead told him to drink water.  Dr. Roche concluded that a shot for pain was not warranted based on the information he received.  However, defendant Roche did not examine plaintiff or ask him about his pain and did not speak with Dr. Lajuenesse about plaintiff's medical needs or pain management.  Finally, Dr. Roche has not explained how or why he determined plaintiff did not have a medical need for pain medication or how or why drinking water is a medically-

acceptable course of treatment for plaintiff's recurrence of kidney stones.  Again, under these circumstances, a reasonable juror could conclude that Dr. Roche responded to plaintiff's serious medical needs with deliberate indifference.

Accordingly, the court concludes that defendant Roche is not entitled to summary judgment in his favor on plaintiff's Eighth Amendment inadequate medical care claims.

III.  Qualified Immunity

For the reasons discussed above, the facts alleged in this case taken in the light most favorable to plaintiff are sufficient if proven to demonstrate that defendant Roche violated plaintiff's rights under the Eighth Amendment.  Moreover, the state of the law in 2004 clearly would have given Dr. Roche fair warning that his failure to provide plaintiff with adequate medical care was unconstitutional.  As the United States Supreme Court has recognized:

> [G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful."

United States v. Lanier, 520 U.S. 259, 271 (1997) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  By 2004, it was well established that prison officials could not be deliberately indifferent to a prisoner's serious medical needs or deny, delay, or intentionally interfere with medical treatment for a prisoner's serious medical needs.  See Estelle, 429 U.S. at 104-06; Hamilton, 981 F.2d 1066-68 (defendants not entitled to qualified immunity when they ignored orders of prisoner's prior physician).  Here, defendant Roche was on notice that he could not ignore Dr. Lajeunesse's order that plaintiff was at significant risk for recurrence of his stricture, would need to be followed closely, and might require intermittent dilatations.  Nor could he ignore plaintiff's recurrence of kidney stones and kidney stone related pain.

Accordingly, the court concludes that defendant Roche is not entitled to summary judgment in his favor with respect to the affirmative defense of qualified immunity.

**CONCLUSION**

IT IS HEREBY RECOMMENDED that defendant Roche's June 4, 2009 amended motion for summary judgment (Doc. No. 72) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 19, 2009.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:9
maga2634.57Roche

31