1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TROY MAGARRELL,

11          Plaintiff,                    No. CIV S-04-2634 LKK DAD P

12      vs.

13   P. MANGIS, M.D., et al.,

14          Defendants.            FINDINGS AND RECOMMENDATIONS

15   _____/

16          Plaintiff is a state prisoner proceeding through counsel with a civil rights action

17   seeking relief under 42 U.S.C. § 1983.  This matter is before the court on defendant Mangis'

18   motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil

19   Procedure.  Plaintiff has filed an opposition to the motion, and defendant has filed a reply.  On

20   July 31, 2009, the undersigned heard oral arguments in this matter.

21                          **BACKGROUND**

22          Plaintiff is proceeding on his original complaint against defendants Mangis and

23   Roche.[1]  Therein, he alleges as follows.  On October 29, 2003, after three days of complaining of

24   _____

25        [1]  Defendant Dr. Mangis is represented by the Office of the Attorney General.  Defendant
     Dr. Roche is represented by Stanzler Funderburk and Castellon, LLP.  Counsel on behalf of
26   defendant Roche has also filed a motion for summary judgment, which the court addresses in
     separate findings and recommendations.

                                    1

1   pain due to kidney stones, plaintiff received a shot containing a pain killer at High Desert State

2   Prison's ("HDSP") Correctional Treatment Center.  Plaintiff went to the yard clinic the next

3   morning for a follow-up visit with defendant Mangis.  Plaintiff overheard the defendant comment

4   that all inmates are drug addicts and that plaintiff merely wanted a shot of dope.  (Compl. at 3.)

5       At the clinic, plaintiff submitted a urine sample, which contained trace amounts of

6   blood.  He also underwent a blood-sugar test.  Plaintiff then met with Dr. Mangis who asked him

7   a series of questions, which allegedly had nothing to do with kidney stones.  Plaintiff told Dr.

8   Mangis to look at his medical file to understand his history with kidney stones, but Dr. Mangis

9   responded by suggesting that plaintiff was only interested in drugs.  Dr. Mangis also accused

10  plaintiff of adding blood to his urine sample.  (Compl. at 3-4 & Ex. C.)

11      Dr. Mangis told plaintiff to lay down on the examining table and bring his knees

12  up and then squeezed plaintiff's left kidney area.  Plaintiff tried to get away and yelled for him to

13  stop, but Dr. Mangis then squeezed plaintiff's right kidney area.  When plaintiff broke away, Dr.

14  Mangis said "See you don't have kidney stones" and ordered correctional officers to take

15  plaintiff back to his cell.  Plaintiff alleges that he had difficulty urinating thereafter and began

16  submitting sick-call slips.  (Compl. at 4.)

17      On November 10, 2003, plaintiff saw Dr. Mangis a second time but the doctor

18  refused to open his medical file and instead touched plaintiff's back with his finger and

19  proclaimed him stone-free.  According to plaintiff, his medical file contained 198 pages

20  documenting his history with kidney stones, dating as far back as 1992, when he was incarcerated

21  at the California Youth Authority.  (Compl. at 4 & Ex. D.)

22      Plaintiff submitted an inmate appeal and explained that he had a kidney stone that

23  was stuck and was causing him pain and hindering his urine flow.  He asked for a diagnostic test,

24  such as an x-ray or an ultrasound.  He also asked to see Dr. Lajeunesse, a urologist familiar with

25  his case, to remove the kidney stone.  Plaintiff did not receive a reply, so he re-submitted the

26  appeal on November 25, 2003.  Again, he did not receive a reply, so he re-submitted the appeal

1  on December 10, 2003, and labeled it an "emergency appeal."  Defendant Dr. Roche, however,

2  refused to treat it as an emergency appeal.  (Compl. at 5 & Ex. F.)

3          On January 16, 2004, plaintiff met with Dr. James regarding his inmate appeal.

4  Dr. James denied the appeal with Dr. Roche's approval.  Plaintiff then submitted additional sick-

5  call slips and sent his appeal to the next level.  Subsequently, plaintiff showed Dr. James his

6  medical file, including a 2002 operative report by Dr. Lajeunesse stating that he would need to be

7  followed closely and that he had a significant risk for recurrence of his stricture.  Dr. James then

8  agreed to send plaintiff to see Dr. Lajeunesse.  (Compl. at 5 & Exs. F, G.)

9          In early May 2004, plaintiff passed a kidney stone.  On May 10, 2004, he saw Dr.

10  Lajeunesse and provided her with the stone for analysis.  He also told her about his seven

11  consecutive months of suffering pain.  Dr. Lajeunesse told correctional officers to take plaintiff

12  across town to the emergency room to have an emergency CT scan.  The scan showed that he had

13  four additional kidney stones, so Dr. Lajeunesse scheduled him for surgery.  (Compl. at 6 & Exs.

14  H, I, J.)

15          On June 16, 2004, plaintiff was in extreme pain and could not urinate.  He could

16  only drip blood from his penis.  Correctional officers emergency transported him to Northern

17  Nevada Medical Center where he passed another kidney stone.  On July 22, 2004, plaintiff saw

18  Dr. Lajeunesse, and she requested an "urgent" operation for him.  (Compl. at 6-7 & Exs. K, L.)

19          On July 23, 2004, plaintiff was in extreme pain again and went to HDSP's

20  Correctional Treatment Center.  Plaintiff alleges that defendant Dr. Roche refused to treat him

21  and told the nurse to send him back to administrative segregation.  Dr. Roche said "We already

22  know you have kidney stones.  Your [sic] scheduled for surgery soon."  On August 3, 2004,

23  plaintiff underwent surgery.  During the procedure, the doctor removed or treated eight kidney

24  stones.  (Compl. at 7-8 & Ex. L.)

25  /////

26  /////

3

1    Plaintiff claims that defendant Drs. Mangis and Roche have been deliberately

2   indifferent to his medical needs in violation of the Eighth Amendment.  Plaintiff requests

3   declaratory relief, injunctive relief, and damages.  (Compl. at 11-12.)

4    **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

5    Summary judgment is appropriate when it is demonstrated that there exists "no

6   genuine issue as to any material fact and that the moving party is entitled to a judgment as a

7   matter of law."  Fed. R. Civ. P. 56(c).

8    Under summary judgment practice, the moving party
     always bears the initial responsibility of informing the district court
9    of the basis for its motion, and identifying those portions of "the
     pleadings, depositions, answers to interrogatories, and admissions
10   on file, together with the affidavits, if any," which it believes
     demonstrate the absence of a genuine issue of material fact.

11

12   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

13   nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

14   judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

15   to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

16   after adequate time for discovery and upon motion, against a party who fails to make a showing

17   sufficient to establish the existence of an element essential to that party's case, and on which that

18   party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

19   concerning an essential element of the nonmoving party's case necessarily renders all other facts

20   immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

21   whatever is before the district court demonstrates that the standard for entry of summary

22   judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

23    If the moving party meets its initial responsibility, the burden then shifts to the

24   opposing party to establish that a genuine issue as to any material fact actually does exist.  See

25   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

26   establish the existence of this factual dispute, the opposing party may not rely upon the

4

1    allegations or denials of its pleadings but is required to tender evidence of specific facts in the

2    form of affidavits, and/or admissible discovery material, in support of its contention that the

3    dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

4    must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

5    of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

6    (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

7    1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

8    return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

9    1436 (9th Cir. 1987).

10           In the endeavor to establish the existence of a factual dispute, the opposing party

11   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

12   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

13   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

14   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

15   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

16   committee's note on 1963 amendments).

17           In resolving the summary judgment motion, the court examines the pleadings,

18   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

19   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

20   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

21   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

22   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

23   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

24   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

25   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

26   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

5

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### OTHER APPLICABLE LEGAL STANDARDS

I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

> The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes
> to be subjected, any citizen of the United States . . . to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution . . . shall be liable to the party injured in an action at
> law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

(1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

omits to perform an act which he is legally required to do that causes the deprivation of which

complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

> Moreover, supervisory personnel are generally not liable under § 1983 for the

actions of their employees under a theory of respondeat superior and, therefore, when a named

defendant holds a supervisorial position, the causal link between him and the claimed

constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

(9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory

allegations concerning the involvement of official personnel in civil rights violations are not

sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

II.  The Eighth Amendment and Inadequate Medical Care

> The unnecessary and wanton infliction of pain constitutes cruel and unusual

punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986);

Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur. Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

Where a prisoner's Eighth Amendment claims arise in the context of medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106. An Eighth Amendment medical claim has two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974 F.2d at 1059 (quoting Estelle v. Gamble, 429 U.S. at 104). Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities." Id. at 1059-60. By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation. Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference. Farmer, 511 U.S. at 834. In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care. Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988). Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

1   Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at

2   105-06).  See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere

3   negligence in diagnosing or treating a medical condition, without more, does not violate a

4   prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate

5   indifference is "a state of mind more blameworthy than negligence" and "requires 'more than

6   ordinary lack of due care for the prisoner's interests or safety.'"  Farmer, 511 U.S. at 835

7   (quoting Whitley, 475 U.S. at 319).

8            Delays in providing medical care may manifest deliberate indifference.  Estelle,

9   429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in

10   providing care, a plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d

11   1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332,

12   1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v.

13   Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a]

14   prisoner need not show his harm was substantial; however, such would provide additional

15   support for the inmate's claim that the defendant was deliberately indifferent to his needs."  Jett

16   v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  See also McGuckin, 974 F.2d at 1060.

17            Finally, mere differences of opinion between a prisoner and prison medical staff

18   as to the proper course of treatment for a medical condition do not give rise to a § 1983 claim.

19   Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v.

20   Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir.

21   1981).

22            **DEFENDANT MANGIS' MOTION FOR SUMMARY JUDGMENT**

23   I.  Defendant Dr. Mangis' Statement of Undisputed Facts and Evidence

24            Defendant Mangis' statement of undisputed facts is supported by citations to

25   plaintiff's complaint as well as by citations to his own declaration signed under penalty of

26   perjury.

The evidence submitted by Dr. Mangis establishes the following.  Defendant Mangis has been practicing medicine for more than 30 years and was a contract doctor providing services to patients housed at HDSP at the time of the events alleged in plaintiff's complaint.  On October 30, 2003, Dr. Mangis examined plaintiff for alleged pain related to a kidney stone.  He ordered medical personnel to take plaintiff's vital signs, get a urine sample from him, and conduct a blood test.  Plaintiff's vital signs were normal.  In addition, plaintiff did not exhibit the typical symptoms associated with passing a kidney stone, such as nausea, vomiting, sweating, excruciating pain radiating to the groin, or lack of appetite.  Based on plaintiff's test results and Dr. Mangis' examination and observations, the defendant believed that plaintiff was greatly exaggerating his symptoms.  Plaintiff did not appear to have an infection.  Nor did he appear to be actively passing a kidney stone.  Dr. Mangis prescribed plaintiff Tylenol for pain and recommended that he be observed.  He also advised plaintiff to "force liquids" or drink additional fluids in case he needed to pass a kidney stone.  (Def.'s SUDF 2-6, Mangis Decl. & Attach.)

On November 10, 2003, Dr. Mangis examined plaintiff again for alleged pain related to a kidney stone.  He ordered medical personnel to take plaintiff's vital signs.  He also examined plaintiff's back and kidney area for signs of pain or infection.  Plaintiff's vital signs were normal.  In addition, plaintiff was relaxed and was not in any acute pain or stress.  Based on plaintiff's test results and Dr. Mangis' examination and observations, the defendant believed that plaintiff did not appear to have an infection.  Nor did plaintiff appear to Dr. Mangis to be actively passing a kidney stone.  In Dr. Mangis' opinion, plaintiff was not in any distress and did not need any further testing or care.  Dr. Mangis also noted that plaintiff's medical records were replete with examples of him showing up requesting pain medication under the guise of passing a kidney stone when he had no objective symptoms.  (Def.'s SUDF 7-13, Mangis Decl. & Attach.)

Dr. Mangis declares that he never refused to examine plaintiff nor did he refuse to provide plaintiff with care or treatment.  He tried to make an accurate evaluation of plaintiff's

condition and provide him with all reasonable and necessary care based on his observations and examinations, and the results of objective testing.  According to Dr. Mangis, he was never aware of any serious risk of injury or harm to plaintiff and never intentionally or knowingly disregarded any such risk to plaintiff.  Dr. Mangis believed that plaintiff did not need any further care or treatment on the dates that he saw him.  Subsequent urine tests in December 2003 were normal and purportedly confirmed that plaintiff was not passing a kidney stone and did not have an infection or other medical condition requiring further care or treatment.  (Def.'s SUDF 14-19, Mangis Decl, Pl.'s Compl. Ex. F.)

## II. Defendant Mangis' Arguments

Defense counsel argues that Dr. Mangis is entitled to summary judgment in his favor on plaintiff's Eighth Amendment claims because there is no evidence that the defendant was deliberately indifferent to plaintiff's medical needs.  For purposes of this motion, Dr. Mangis concedes that a significant infection or the active passing a kidney stone is a serious medical condition.  However, here, counsel argues that Dr. Mangis honestly did not believe that plaintiff had an infection or was actively passing a kidney stone.  Moreover, counsel contends that, even if the Dr. Mangis was wrong in this regard and failed to order or conduct every possible medical test, his conduct amounts to nothing more than negligence or medical malpractice and does not rise to the level of deliberate indifference.  Counsel also contends that plaintiff's belief that he should have received other diagnostic tests is a mere difference of opinion between a prisoner and prison medical staff as to the proper course of medical treatment.  In any event, counsel argues, plaintiff received additional diagnostic tests one month later that confirmed that he did not have an infection, was not passing a kidney stone and did not need further treatment.  (Def.'s Mem. of P. & A. at 6-7.)

## III. Plaintiff's Opposition

Plaintiff's opposition to defendant's motion for summary judgment is supported by a response to defendant Mangis' statement of undisputed facts and a separate statement of

1  disputed facts.  It is also supported by citations to plaintiff's deposition transcript, plaintiff's

2  medical records, and defendant Mangis' deposition transcript.

3         Counsel for plaintiff argues that there is a disputed issue of material fact as to

4  whether defendant Mangis was deliberately indifferent to plaintiff's serious medical needs.  By

5  way of background, counsel explains that plaintiff has had a long history of kidney stones, having

6  suffered approximately 40 kidney and urinary tract stones since 1991.  Plaintiff has been

7  hospitalized and has undergone surgery for the stones on several occasions.  On October 29,

8  2003, plaintiff went to HDSP's emergency room complaining of left flank pain that radiated to

9  the left side of his abdomen.  Plaintiff received pain medication and subsequently a ducat to go to

10  the yard clinic the next day.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 3-4, 6 & Pl.'s Dep. at

11  10-25, 43-45.)

12         On October 30, 2003, plaintiff went to the yard clinic and submitted a urine

13  sample to the nurse that contained trace amounts of blood.  He also completed a blood sugar

14  finger-stick test.  When plaintiff saw Dr. Mangis, the defendant refused to open plaintiff's

15  medical file and accused him of drug-seeking.  Dr. Mangis squeezed plaintiff's left side and

16  proclaimed him stone free without further testing.  Dr. Mangis squeezed plaintiff so hard that it

17  caused him excruciating pain.  Plaintiff was unable to urinate for 18 hours after this medical visit.

18  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 6 & Pl.'s Dep. at 54-67.)

19         Between October 30, 2003, and November 10, 2003, plaintiff submitted an

20  estimated five or six sick-call slips.  On November 10, 2003, he saw Dr. Mangis a second time.

21  Again, Dr. Mangis labeled plaintiff a drug-seeker and did not conduct any tests or diagnose

22  plaintiff's recurrence of kidney stones.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 6 & Pl.'s

23  Dep. at 71, 73-84.)

24         On November 10, 2003, plaintiff began filing inmate appeals regarding his kidney

25  stones and Dr. Mangis' alleged conduct.  On May 10, 2004, plaintiff saw his outside urologist,

26  Dr. Lajeunesse, and on the same day she ordered a CT scan.  The scan revealed that plaintiff had

three kidney stones in his right kidney and one kidney stone in his left kidney.  On August 3, 2004, plaintiff underwent surgery to remove or treat the kidney stones thereby relieving him of his pain.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 6-8 & Exs. F, G.)

Counsel argues that defendant Mangis allowed plaintiff to suffer unnecessarily from extreme kidney stone pain for seven months until a urologist removed his kidney stones on August 3, 2004.  Dr. Mangis admits that he was aware that plaintiff had a history of kidney stones.  However, during plaintiff's first visit with him, Dr. Mangis refused to look at plaintiff's medical chart.  In addition, despite the fact that plaintiff complained of severe pain and had visited the emergency room the night before for the same pain, Dr. Mangis failed to order any diagnostic tests to determine whether plaintiff was suffering from a recurrence of kidney stones.  Instead, he labeled plaintiff a drug-seeker and proclaimed him stone-free.  Similarly, during plaintiff's second visit, Dr. Mangis failed to perform a urine test or conduct a manual exam.  According to the defendant's own progress note, he had already concluded that plaintiff was merely seeking pain medication.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 10-11.)

Counsel argues that, by completely disregarding plaintiff's extensive history of kidney stones, and by failing to diagnose and treat plaintiff's recurrence of kidney stones, Dr. Mangis knew of and disregarded the risks to plaintiff's health, including the severe pain plaintiff would continue to suffer.  Dr. Mangis knew that kidney stone pain could be severe and that plaintiff complained of pain and had blood in his urine, both of which Dr. Mangis acknowledges are consistent with a kidney stone.  Moreover, counsel notes that appropriate diagnostic tests, specifically, a KUB (kidney, ureter, bladder) X-ray, were available at the prison and would have detected the presence of kidney stones.  However, Dr. Mangis simply concluded that plaintiff was a drug-seeker.  That plaintiff did not receive any diagnostic study to determine whether he was suffering from a recurrence of kidney stones represents an unreasonable delay and denial of necessary medical treatment.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 9-11.)

/////

IV.  <u>Defendant Mangis' Reply</u>

In reply, defense counsel reiterates that plaintiff's vital signs were normal during his first visit in October 2003.  Dr. Mangis would have expected that someone suffering from excruciating pain from a kidney stone would have an elevated pulse and blood pressure or would exhibit symptoms such as nausea, vomiting, sweating, excruciating pain to the groin, or lack of appetite.  In addition, according to the defendant, trace amounts of blood in a urine test is not uncommon in someone like plaintiff who has had prior operations.  Finally, Dr. Mangis conducted a physical examination of plaintiff's flank areas, and they were "negative for any objective evidence of tenderness or tenseness."  In Dr. Mangis' opinion, there were no objective findings consistent with kidney stones and no reason to order further testing.  (Def.'s Reply at 2-3, 5-6.)

Defense counsel also argues that Dr. Mangis did not simply look at plaintiff and declare him stone-free during his second visit in November 2003.  Even plaintiff admits in his complaint that Dr. Mangis at least felt his back.  In addition, plaintiff's medical records indicate that his vital signs were normal and that plaintiff was relaxed and not in acute stress.  Counsel acknowledges that the court may not make credibility determinations on a motion for summary judgment, but counsel contends that the opposing party may not create a triable issue of fact by contradicting his own verified complaint and exhibits.  (Def.'s Reply at 6.)

Defense counsel notes that plaintiff has not offered any medical expert or competent testimony that any further testing, care, or treatment was necessary for plaintiff.  Moreover, counsel contends that plaintiff's lay opinion is insufficient to create a triable issue of fact regarding Dr. Mangis' state of mind or the validity of Dr. Mangis' medical opinions.  At most, plaintiff disagrees with Dr. Mangis' assessments and believes that he should have done more.  However, such a disagreement is insufficient to state a claim for deliberate indifference.  Moreover, counsel contends that even if Dr. Mangis was wrong in his medical opinions, at most,

/////

1   he was negligent in failing to order further testing and such negligence is insufficient to support a

2   claim for deliberate indifference.  (Def.'s Reply at 6.)

3            Finally, defense counsel reiterates that plaintiff underwent additional objective

4   tests one month after his contacts with Dr. Mangis.  Specifically, on December 15, 2003,

5   plaintiff's urinalysis was normal.  His urine dip test was also normal with no signs blood or

6   bleeding.  His own doctor determined that there was no evidence that he had any kidney stones or

7   a bladder infection, so there was no urgent need for further investigation.  (Def.'s Reply at 6-7.)

8                                        **ANALYSIS**

9   I.  <u>Plaintiff's Serious Medical Needs</u>

10           The undersigned concludes that based upon the evidence presented by the parties

11  in connection with the pending motion that a reasonable juror could conclude that plaintiff's

12  recurring kidney stones and related pain constitute objective, serious medical needs.  <u>See</u>

13  <u>McGuckin</u>, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient

14  would find important and worthy of comment or treatment; the presence of a medical condition

15  that significantly affects an individual's daily activities; or the existence of chronic and

16  substantial pain are examples of indications that a prisoner has a 'serious' need for medical

17  treatment."); <u>see</u> <u>also</u> <u>Canell v. Bradshaw</u>, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth

18  Amendment duty to provide medical care applies "to medical conditions that may result in pain

19  and suffering which serve no legitimate penological purpose.").  Specifically, plaintiff's long and

20  largely undisputed medical history demonstrates that a failure to treat him could result in "further

21  significant injury" and the "unnecessary and wanton infliction of pain."  <u>See, e.g.</u>, <u>McGuckin</u>,

22  974 F.2d at 1059.  Accordingly, defendant Mangis' motion for summary judgment hinges on

23  whether, based upon the evidence before the court, a rationale jury could conclude that the

24  defendant responded to plaintiff's serious medical needs with deliberate indifference.  <u>Farmer</u>,

25  511 U.S. at 834; <u>Estelle</u>, 429 U.S. at 106.

26  /////

II.  Defendant Mangis' Response to Plaintiff's Serious Medical Needs

The court finds that defendant Mangis has borne his initial responsibility of demonstrating that there is no genuine issue of material fact with respect to the adequacy of the medical care provided to plaintiff.  Defendant's evidence demonstrates that he met with plaintiff on two occasions.  On October 30, 2003, Dr. Mangis met with plaintiff for alleged pain related to a kidney stone.  According to plaintiff's medical records, plaintiff's vital signs were normal.  In addition, plaintiff did not present the typical symptoms associated with passing a kidney stone, such as nausea, vomiting, sweating, excruciating pain radiating to the groin, or lack of appetite.  Nor did plaintiff confirm such symptoms when defendant Mangis asked about them specifically.  Dr. Mangis observed that plaintiff's descriptions of pain and discomfort did not fit the classical picture of a patient passing a kidney stone.  Dr. Mangis' examination of plaintiff was also negative for any objective tenderness or tenseness.  Based on plaintiff's test results and defendant's examination and observations, he believed that plaintiff did not appear to have an infection or to be actively passing a kidney stone.  Dr. Mangis prescribed plaintiff Tylenol for pain and recommended that plaintiff be observed.  He also advised plaintiff to "force liquids" or drink additional fluids in case he needed to pass a kidney stone.  (Mangis Decl. & Attach.)

On November 10, 2003, Dr. Mangis met with plaintiff a second time for alleged pain related to a kidney stone.  According to plaintiff's medical records, plaintiff's vital signs were normal, he was relaxed and in no acute or active distress.  Dr. Mangis saw no sign that plaintiff was actively passing a kidney stone.  Dr. Mangis recorded in his progress note that plaintiff had a history of "incessant medication line visits," and was "medication seeking, likely pain or muscle relaxant type, on ruse of having active kidney stone."  Dr. Mangis informed plaintiff that if he did have a kidney stone but it was not active or moving forward through the ureter, it would be unlikely to cause him pain or obstruction.  (Mangis Decl. & Attach.)

Plaintiff's subsequent urine tests in December 2003 were normal and indicated that he was not passing a kidney stone and did not have an infection or other medical condition

1 requiring further care or treatment.  (Pl.'s Compl. Ex. F.)  Given this evidence, the burden shifts

2 to plaintiff to establish the existence of a genuine issue of material fact with respect to his

3 deliberate indifference claim.

4       The court finds that a reasonable juror could conclude that Dr. Mangis responded

5 to plaintiff's serious medical needs with deliberate indifference.  Farmer, 511 U.S. at 834;

6 Estelle, 429 U.S. at 106.  In so concluding, the court has considered plaintiff's opposition to the

7 pending motion for summary judgement, his sworn deposition testimony, and his verified

8 complaint.  On defendant Mangis' motion for summary judgment, the court is required to believe

9 plaintiff's evidence and draw all reasonable inferences from the facts before the court in

10 plaintiff's favor.  Drawing all reasonable inferences in plaintiff's favor, the court finds that

11 plaintiff has submitted sufficient evidence to create a genuine issue of material fact precluding

12 summary judgment in favor of defendant Mangis.

13       Defense counsel argues that Dr. Mangis was never aware of any serious risk of

14 injury or harm to plaintiff and never intentionally or knowingly disregarded any serious risk of

15 injury or harm to plaintiff.  However, this court cannot grant defendant's motion for summary

16 judgment simply based on his assertion as to his own state of mind.  As the Ninth Circuit recently

17 has explained:

18     Proof of "subjective awareness" is not limited to the purported recollections of the individuals involved.  "Whether an official had

19 the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference

20 from circumstantial evidence."  Indeed, in certain circumstances, "a factfinder may conclude that [an] official knew of a substantial

21 risk from the very fact that the risk was obvious. . . ."

22           * * *

23     "[Q]uestions involving a person's state of mind are generally factual issues inappropriate for resolution by summary judgment."

24 We, of course, "may not make credibility determinations or weigh conflicting evidence."  (internal citations omitted)

25

26 Conn v. City of Reno, __ F.3d __, __, 2009 WL 2195338 at *7 & *9 (9th Cir. July 24, 2009).

1         In this case, plaintiff has a long and largely undisputed medical history of

2   recurring kidney stones.  Plaintiff's evidence establishes that, as early as June 1991, he was

3   hospitalized overnight for kidney stone related pain.  In the two years that followed, plaintiff was

4   hospitalized on several other occasions for the same reason.  At times, plaintiff experienced

5   bleeding, blood in his urine, and pain.  In February 1993, plaintiff underwent his first surgery for

6   kidney stones.  In the ensuing years through 1998, plaintiff was hospitalized on several more

7   occasions and passed at least two kidney stones.  From 1998 through early 2002, plaintiff did not

8   have any active kidney stones.  However, in May 2002, plaintiff underwent his second surgery

9   for kidney stones.  Dr. Lajeunesse performed the surgery and explained in her operative report

10  that "[plaintiff] is at significant risk for recurrence of his stricture and will need to be followed

11  closely and may require intermittent dilatations."  In December 2002, HDSP's Dr. Weaver

12  treated plaintiff for kidney stones again.  Up to that point, each time plaintiff received medical

13  care for kidney stones and kidney stone related pain, he received pain medication, including

14  Toradol or Morphine.  (Pl.'s Dep. at 11-17, 21, 24 & Compl. Ex. G.)

15        Dr. Mangis acknowledges that he was aware of plaintiff's medical history with

16  respect to his kidney stones.  Dr. Mangis also acknowledges that he was aware that on October

17  29, 2003, plaintiff visited the emergency room complaining about kidney stones and kidney stone

18  related pain.  Finally, Dr. Mangis acknowledges that on October 30, 2003, and November 10,

19  2003, plaintiff visited the yard clinic and complained about the same kidney stones and kidney

20  stone related pain to him.  (Compl. Ex. B. & Def.'s Dep. at 72.)  Under these circumstances, a

21  reasonable juror could conclude that plaintiff's medical needs were so obvious that Dr. Mangis

22  should have been aware of the substantial risk of injury or harm to plaintiff.

23        Defense counsel argues that, even if the defendant failed to order appropriate

24  diagnostic tests, his failure amounts to nothing more than mere negligence or medical

25  malpractice.  Moreover, counsel contends, plaintiff's belief that he should have received other

26  diagnostic tests is a mere difference of opinion.  Defense counsel is correct that "[m]ere

1  'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

2  Broughton, 622 F.2d at 460.  Likewise, a mere difference of opinion between a prisoner and

3  prison medical staff does not give rise to a § 1983 claim.  Toguchi, 391 F.3d at 1058; Jackson, 90

4  F.3d at 332; see also Fleming v. Lefevere, 423 F. Supp. 2d 1064, 1070 (C.D. Cal. 2006)

5  ("Plaintiff's own opinion as to the appropriate course of care does not create a triable issue of

6  fact because he has not shown that he has any medical training or expertise upon which to base

7  such an opinion.").

8          However, the evidence before the court indicates that this case may involve much

9  more than mere negligence or medical malpractice and more than a mere difference of medical

10  opinion over the appropriate course of treatment.  See, e.g., Estelle, 429 U.S. at 104-05 (holding

11  that deliberate indifference may manifest "by prison doctors in their response to the prisoner's

12  needs or by prison guards in intentionally denying or delaying access to medical care or

13  intentionally interfering with the treatment once prescribed"); Lopez v. Smith, 203 F.3d 1122,

14  1132 (9th Cir. 2000) (holding that a prisoner may establish deliberate indifference by showing

15  that a prison official intentionally interfered with his medical treatment); Wakefield v.

16  Thompson, 177 F.3d 1160, 1165 & n.6 (9th Cir. 1999) (holding that "a prison official acts with

17  deliberate indifference when he ignores the instructions of the prisoner's treating physician or

18  surgeon.").

19          On October 29, 2003, after three days of complaining by plaintiff of pain due to

20  kidney stones, a correctional officer drove plaintiff from administrative segregation to HDSP's

21  Correctional Treatment Center.  According to plaintiff, correctional officers had previously

22  refused to send him to see medical personnel, so he held his dinner tray until the sergeant in

23  charge promised to bring him to the Correctional Treatment Center.  Once at the Center, plaintiff

24  complained of kidney pain and demanded to see a doctor.  Plaintiff received 30 mg of Toradol

25  and Tylenol and subsequently received a ducat to visit the yard clinic the following day.  (Pl.'s

26  Dep. at 37-38, 44-45, Compl. Ex. A.)

On October 30, 2003, plaintiff went to the yard clinic.  According to plaintiff's sworn deposition testimony, before he even had a chance to see Dr. Mangis he overheard the doctor tell Medical Technical Assistant ("MTA") Barton that all inmates were "dope phenes (sic)" and only looking for medication.  MTA Barton then gave plaintiff a cup for a urine sample.  Plaintiff provided MTA Barton with a urine sample, which contained trace amounts of blood.  MTA Barton also performed a blood-sugar test on plaintiff.  (Pl.'s Dep. at 48-52, 65-66.)

Correctional officers next brought plaintiff into the examining room where Dr. Mangis proceeded to ask him about the hospitals at which he has received treatment for his kidney stones.  Plaintiff told him that he was having difficulty remembering and speaking because he was in pain and that Dr. Mangis could find all of the dates and information he was looking for in plaintiff's medical file in front of him.  Dr. Mangis, however, refused to review plaintiff's medical file and instead began punching himself in the head, saying he was having audio-reception difficulties.  Emphasizing each word, he said, "No, I want to know what hospitals you have been in."  (Pl.'s Dep. at 53-59.)  Dr. Mangis then asked plaintiff to describe his pain.  Plaintiff explained that his pain was moving from front to back and back to front in a wrap-around fashion.  He explained to Dr. Mangis that a kidney stone was causing his pain, but the doctor responded, "Well, I don't believe you have kidney stones."  Plaintiff asked Dr. Mangis to explain why he had blood in his urine sample, and the defendant responded by accusing him of putting blood in the sample.  (Pl.'s Dep. at 59.)

Dr. Mangis told plaintiff to lay on the examining table and squeezed his left kidney area.  Plaintiff yelled "what are you doing," and the defendant squeezed plaintiff's right kidney area.  Plaintiff broke away from the defendant because he was "digging in as hard as he could" and hurting him.  Dr. Mangis then ordered correctional officers to take plaintiff out of the room.  After the visit, plaintiff was in pain and curled up on his bed.  He could not urinate until the middle of the night.  Plaintiff then submitted an estimated five or six sick-call slips to Nurse Daniels and explained that he was in pain on a daily basis.  (Pl.'s Dep. at 59-63.)

On November 10, 2003, plaintiff went to the yard clinic again.  A nurse took his blood pressure and temperature and weighed him.  When Dr. Mangis saw plaintiff, he commented "Oh, you again."  He then told plaintiff to stand up.  Dr. Mangis touched plaintiff's side and proclaimed that he was stone-free.  He then instructed correctional officers to take plaintiff out of the clinic.  Dr. Mangis never looked at plaintiff's medical file, and he never gave plaintiff an opportunity to convey any of his subjective symptoms to him.  According to Dr. Mangis' own progress note, he did not evaluate plaintiff's flank or conduct a urine test because "patient's history proceeds him as one looks at multiple progress notes in chart."  Dr. Mangis believed that plaintiff was "medication seeking, likely pain or muscle relaxant type, on ruse of having active kidney stone."  (Pl.'s Dep. at 73, 76-82, Compl. Ex. E.)

Thus, notwithstanding plaintiff's long and largely undisputed medical history with recurring kidney stones, on October 30, 2003, and November 10, 2003, defendant Mangis refused to review plaintiff's medical file or thoroughly examine him.  He also failed to order any diagnostic tests to determine whether plaintiff was suffering from a recurrence of kidney stones even though the defendant acknowledges that such tests, specifically a KUB X-ray, were available at the prison.  (Def.'s Dep. at 103-104.)  Finally, Dr. Mangis rejected plaintiff's urine sample, accusing him of adding blood to it, and refused to address plaintiff's pain.  According to Dr. Mangis' progress note, he believed that plaintiff was "medication seeking."  Given this evidence, a reasonable juror could conclude that defendant Mangis responded to plaintiff's serious medical needs with deliberate indifference.

Finally, defense counsel argues that plaintiff underwent additional tests in December 2003 that demonstrated that he did not have an infection, was not passing a kidney stone, and did not need further treatment.  In support of the argument, defense counsel relies on defendant Roche's response to plaintiff's inmate appeal.  Therein, Dr. Roche adopted Dr. James' findings, which were based on an interview he had with plaintiff.  In this regard, defendant Roche wrote:

1        Dr. James reviewed your medical history and noted that you have
2        had renal versus urethral stones in the past.  On 12/15/03 your
     urinalysis showed a specific gravity of 1.025 and on 1/16/04 it was
3        1.015, which are within normal range.  Your urine dip test showed
     no blood or white blood cells present.  He states that there is no
     current evidence that you have kidney stones or a bladder infection.
4        Based on this there is no urgent need for further investigation.

5   (Compl. Ex. F.)

6           The court finds that defendant Roche's response to plaintiff's inmate appeal raises

7   more questions than it resolves.  For example, it is not at all clear from defense counsel's

8   argument or the evidence presented that a normal urinalysis and a lack of blood in plaintiff's

9   urine sample in December 2003 indicates that plaintiff did not have a recurrence of kidney stones

10  or kidney stone related pain in October and November 2003, when he saw Dr. Mangis.  In fact, in

11  contrast to his December 2003 urine sample, it is undisputed that blood appeared in plaintiff's

12  October 2003 urine sample.

13          In addition, although Dr. James' findings indicated that plaintiff did not need

14  additional diagnostic tests or medical treatment because his urinalysis was normal and his urine

15  dip test showed no blood or white blood cells present, less than two months later Dr. James

16  himself recommended that plaintiff be seen by Dr. Lajeunesse for his condition.  Dr. James did

17  not appear to base his subsequent recommendation on a new urinalysis or a diagnostic test.  In

18  fact, plaintiff's urinalysis at the time of Dr. James' subsequent recommendation was also

19  negative for trace amounts of blood.  Rather, Dr. James appears to have based his subsequent

20  referral on a review of plaintiff's existing medical records, specifically, Dr. Lajeunesse's opinion

21  that plaintiff was at significant risk for recurrence of his stricture, would need to be followed

22  closely, and might require intermittent dilatations.  (Pl.'s Dep. at 90-92 & Compl. Ex. G.)

23          Moreover, although defendant Roche issued the written response to plaintiff's

24  inmate appeal, Dr. Roche himself now appears to dismiss the presence of blood in urine or lack

25  of blood in urine as evidence of a kidney stone.  Thus, at his deposition, Dr. Roche testified that:

26  /////

a number of people walk around with kidney stones that are totally
asymptomatic, and so having – having blood in your urine is not a
diagnosis of a kidney stone.  Not having blood in your urine is not
a diagnosis of a kidney stone.

(Def. Roche Dep. at 46.)

Finally, the evidence before the court establishes that in May 2004, plaintiff

passed a kidney stone.  On May 10, 2004, plaintiff saw Dr. Lajeunesse and provided her with a

kidney stone for analysis.  She ordered a CT scan on the same day, which revealed that plaintiff

had three kidney stones in his right kidney and one kidney stone in his left kidney.  On June 16,

2004, Dr. Lajeunesse performed a procedure enabling plaintiff to pass another kidney stone and

admitted him to Northern Nevada Medical Center for pain control.  On August 3, 2004, plaintiff

underwent surgery, and Dr. Lajeunesse removed and treated multiple kidney stones.  (Compl.

Exs. I-M.)  Given this evidence, regardless of what diagnostic tests performed on plaintiff in

December of 2003 may or may not have shown, a reasonable juror could conclude that defendant

Mangis was deliberately indifferent to plaintiff's serious medical needs.

Accordingly, the court concludes that defendant Mangis is not entitled to

summary judgment on plaintiff's Eighth Amendment inadequate medical care claims.[2]

## CONCLUSION

IT IS HEREBY RECOMMENDED that defendant Mangis' June 5, 2009

amended motion for summary judgment (Doc. No. 74) be denied.

These findings and recommendations are submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

---

[2]  Defense counsel has filed formal objections to plaintiff's exhibits in support of his
opposition to defendant's motion for summary judgment.  Those exhibits include excerpts from
plaintiff's deposition and defendants' deposition, copies of plaintiff's inmate appeal and prison
officials responses thereto, and copies of plaintiff's medical records.  Defense counsel argues,
inter alia, that the exhibits lack identification, foundation, and proper authentication.  The
objections are overruled.  See Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003) ("At
the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We
focus instead on the admissibility of its contents.").

1  days after being served with these findings and recommendations, any party may file written

2  objections with the court and serve a copy on all parties.  Such a document should be captioned

3  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

4  shall be served and filed within ten days after service of the objections.  The parties are advised

5  that failure to file objections within the specified time may waive the right to appeal the District

6  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

7  DATED: August 19, 2009.

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:9
maga2634.57Mangis